[Cite as *Gillespie v. Troy*, 2026-Ohio-2526.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| MARSHA GILLESPIE ADMINISTRATOR | : | C.A. No. 30686 |
| | : | |
| Appellees | : | Trial Court Case No. 2023 CV 00496 |
| | : | |
| v. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| CITY OF TROY ET AL. | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellants | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 2, 2026, the judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with the opinion.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

MICHAEL L. TUCKER, JUDGE

LEWIS, P.J., and HANSEMAN, J., concur.

OPINION

MONTGOMERY C.A. No. 30686


NICHOLAS E. SUBASHI and TABITHA JUSTICE, Attorneys for Appellants
CHRISTIAN R. PATNO, COLIN R. RAY, NATHAN J. STUCKEY, and PAUL GIORGIANNI, Attorneys for Appellees


TUCKER, J.

{¶ 1} The City of Troy and four employees of its police department appeal from the trial court's overruling of their motion for summary judgment on the issue of statutory immunity from tort liability for a high-speed vehicle pursuit that ended in a fatal accident.

{¶ 2} The appellee is Marsha Gillespie, administrator of the estate of Chelsey Vollmer, a motorist who was killed when a fleeing suspect's vehicle struck her car broadside at approximately 108 miles per hour.

{¶ 3} The city and the involved employees—Officer Shane Marker, Sergeant John Marshall, Captain Zachariah Mumford, and Chief Shawn McKinney—contend the trial court erred in not finding them immune from liability under R.C. Chapter 2744. Marker, Marshall, Mumford, and McKinney claim immunity under R.C. 2744.03(A)(6) because they did not act with malicious purpose, in bad faith, or in a wanton or reckless manner as a matter of law. The city claims immunity under R.C. 2744.02(B)(1)(a) because Marker, Marshall, Mumford, and McKinney did not engage in willful or wanton misconduct as a matter of law.

{¶ 4} Applying the immunity statute to the evidence, we conclude that none of the appellants can be held liable for damages based on their actions. Viewing the evidence in a light most favorable to Gillespie, there are no genuine issues of material fact, and reasonable minds could only conclude that the city and its employees are entitled to judgment as a matter of law based on immunity. Accordingly, we reverse the trial court's judgment and remand the case for entry of final judgment in the appellants' favor.

# I. Factual Background

**{¶ 5}** In its ruling, the trial court thoroughly and accurately set forth the events underlying the present lawsuit as follows:

On March 30, 2021, Chelsey Vollmer was killed while she drove to work as the result of a collision with a Jeep driven by Jalen Alexander. Jalen was being pursued by Troy Police Officer Shane Marker. On that day, Officer Marker was on normal patrol as part of his duties as a Troy police officer. Marker Depo., 80:19-23. He had begun his patrol that day at approximately seven o'clock in the morning. Marker Depo., 86:21-22. He arrived at Imperial Court in Troy a little before eight o'clock in the morning. Marker Depo., 86:23-87:1. As he drove down Imperial Court, he observed a red Jeep Cherokee, the engine of which was running, parked in a driveway. Marker Depo., 89:11-12.

Officer Marker was familiar with the Jeep. He knew at the time he encountered the Jeep that Jalen Alexander was known to drive the vehicle, which was registered to his girlfriend, Tashaya Tipton. Marker Depo., 65:25-66:1. Tashaya lived at the Imperial Court address along with her young child. Marker Depo., 65:24-25; 78:23-79:17. Officer Marker did not think Jalen stayed at the Imperial Court address, but he knew there was potential he would be there. Marker Depo., 79:24-80:10; 68:19-22; 72:3-6.

Officer Marker knew that Jalen had previously been arrested by Troy police at the Imperial Court address. Marker Depo., 63:21-25. Officer Marker was also aware that Jalen had failed to appear on an arrest warrant for felony charges. Marker Depo., 64:21-22. Officer Marker was in the daily habit of checking for arrest warrants, and he knew that Jalen was wanted on arrest

3

warrants issued out of Miami County and Greene County, Ohio. Marker Depo., 64:24-65:5. In fact, Greene County police had specifically requested that Troy police attempt to locate Jalen. Marker Depo., 65:8-11; 78:19-21. The warrant for Jalen's arrest from Greene County had been issued several weeks before. Marker Depo., 66:16-17.

In addition, Officer Marker knew that Jalen's Miami County arrest warrant was based on an incident in which Jalen had fired a gun at Tashaya's father in Piqua, Ohio. Marker Depo., 66:21-22; 67:1-3. On that occasion, Jalen had been arrested by Troy police as he was pulling into the Imperial Court address. Marker Depo., 67:7-10; 67:12-13. Officers had initiated a traffic stop, and Jalen had pulled over. Marker Depo., 67:12-13; 97:18-21. Police had recovered a firearm from Jalen on that occasion. Marker Depo., 98:10-12; 148:1-17. However, the shooting incident had occurred on March 7, 2021, so it had been several weeks since that incident. Marker Depo., 68:11-12. Nevertheless, Officer Marker wanted to pick up Jalen on his warrants. Marker Depo., 72:13-17.

As Officer Marker drove down Imperial Court that day, he could see the Jeep running in a driveway. Marker Depo., 89:11-12. He turned around in the cul-de-sac's dead end. Marker Depo., 89:22-25; 90:1-3. He saw that the red Jeep Cherokee had temporary tags, and he ran them. Marker Depo., 90:16-22. Thereafter, Officer Marker drove off of Imperial Court and onto an intersecting street, Stoneyridge. Marker Depo., 91:5-9. Stoneyridge had a parking lot, and Officer Marker pulled into it, placing his police cruiser near the

4

lot's entrance onto the street. Marker Depo., 91:13-20. From that vantage point, Officer Marker did not have a view of the Jeep. Marker Depo., 91:21-23.

At that point, Officer Marker did not speak to anyone over his police radio. Marker Depo., 94:23-95:1. However, he requested assistance by direct messaging another officer. Marker Depo., 92:14-16. He stated that Jalen was at the Imperial address and requested assistance. Marker Depo., 93:1-3. He asked another officer, Spillman, to run the Jeep's license plates, which returned as belonging to Tashaya Tipton. Marker Depo., 93:19-21; 94:4; 107:5. He had not seen anyone inside the Jeep. Marker Depo., 94:7. Although its windows were tinted, he did not even see any silhouettes. Marker Depo., 94:8-14. He did, however, see that the vehicle was running and surmised someone intended to leave. 99:4-7.

Officer Marker received a response from Officer Brian Ross, who stated that he was on his way. Marker Depo., 94:16-19. Although Officer Marker could not see the Jeep from his vantage point, he stayed in the parking lot to wait for the second officer. Marker Depo., 95:20-22. At that point, Officer Marker knew he had options to try to effect Jalen's arrest. One option was that he could have pulled up behind the Jeep as it remained parked in the driveway. Marker Depo., 96:9-11; 127:2-6. Officer Marker had been trained to control a vehicle by pinning it in. Marker Depo., 127:21-24. Another option was to block the street and obstruct the court. Marker Depo., 96:12-17. Again, Officer Marker had been trained to obstruct a vehicle's path of egress. Marker Depo., 127:25-128:3. Officer Marker was not sure why he did not choose this option, and could only say that he was not in habit of blocking roadways. Marker Depo.,

5

96:21-24. But Officer Marker felt that if he had tried to block in an unoccupied vehicle, he had a lower chance of apprehending Jalen. Marker Depo., 128:9-15. Officer Marker also knew that, if he had been in view, he had a diminished likelihood of apprehending Jalen. Marker Depo., 97:9-11. Moreover, Officer Marker thought that if he knocked on the door, it was likely that he would get no response or be turned away by Tashaya Tipton. Marker Depo., 96:4-8; 129:17-19.

Officer Marker believed that, if he had parked at the end of the street, Jalen simply would not exit the house, thereby continuing to pose a risk to the public by being at large. Marker Depo., 128:18-22; 129:1-4. He knew that he would never have probable cause to get a warrant for Tashaya's house, since he did not know what behavior Jalen's Greene County arrest warrant was based on, and he had no evidence Jalen had engaged in violent behavior since he had bonded out after the March 7, 2021 episode. Marker Depo., 130:20-132:10.

Officer Marker saw the Jeep leaving the Imperial Court address. Marker Depo., 99:17. He saw the Jeep pull out to his left. Marker Depo., 100:19-20. Officer Marker, who estimated that he was 100 feet away, could see a single silhouette in the Jeep, which he believed was that of Jalen. Marker Depo., 102:21-22; 104:10-12. Due to the Jeep's darkly tinted windows, Officer Marker could not say for certain who was driving the Jeep. Marker Depo., 103:2-6. But, based on the silhouette that he could see, Officer Marker did not believe that Tashaya Tipton was driving the Jeep. Marker Depo., 206:12-207:16. The Jeep got to a nearby stop sign, then made a right turn. Marker Depo., 104:15-

6

20. Officer Marker did not radio or message anyone, but instead determined that he had probable cause to make a traffic stop due to the Jeep's darkly tinted windows. Marker Depo., 105:1-21.

Once the Jeep had stopped at the stop sign, Officer Marker pulled his police cruiser behind the vehicle. Marker Depo., 108:8-14. The Jeep was operating legally, so Officer Marker had not yet activated his lights or siren. Marker Depo., 108:15-22. The Jeep continued to operate lawfully as it made another turn onto a residential street, and Officer Marker still had not activated his lights or siren. Marker Depo., 108:25-109:3; 109:12-16; 109:24-110:1. At that point, Officer Marker called out a traffic stop and activated his lights. Marker Depo., 110:13-14. For the first time, Officer Maker called out the location of the attempted traffic stop over his radio. Marker Depo., 110:15-20.

After Officer Marker activated his lights to attempt to stop the Jeep, it failed to stop. Marker Depo., 111:3-5. Officer Marker could only see one occupant inside the Jeep; he believed the occupant was Jalen, but he could not actually make out who was driving. Marker Depo., 111:20-24. Jalen was known to drive the vehicle, and it had failed to stop. Marker Depo., 130:4-6. Instead, the vehicle immediately accelerated, and began leading Officer Marker on a high speed chase through the residential neighborhood at approximately eight o'clock on a weekday morning. Marker Depo., 113:9-11; 114:17-22. The speed limit in the neighborhood was 25 miles per hour, but the Jeep and the officer were travelling much faster than the posted speed limit as the vehicle attempted to evade capture. Marker Depo., 113:15-17; 114:9-13.

7

Officer Marker did not have assistance in the immediate vicinity. Marker Depo., 114:23-25.

Officer Marker immediately began to update his location and pursuit over the radio so that his supervisors could make an assessment. Marker Depo., 115:6-22. Although the supervisors were not required to join the radio conversation tracking the pursuit, it was a common practice for them to do so. Marker Depo., 119:18-25. Accordingly, Chief McKinney joined in the radio conversation shortly after the pursuit began; Marshall joined in almost immediately; and Mumford also joined in on the radio conversation shortly after the pursuit began. Marker Depo., 118:8-119:8.

Officer Marker continued to pursue the Jeep as its speed reached 50 miles per hour on residential streets, where vehicles were parked. Marker Depo., 124:5-13; 137:7-10. Officer Marker knew that, at 8:00 a.m. on a weekday, he could expect people to be out in the neighborhood, getting up and leaving for work and school, even though traffic was light at that time. Marker Depo., 124:14-125:14. The pursuit continued, accelerating to 65 miles per hour in a residential neighborhood, then turning onto State Route 202. Marker Depo., 145:9-146:6. Almost immediately after turning onto State Route 202, the Jeep accelerated to nearly 100 miles per hour. Marker Depo., 146:10-17. Officer Marker still believed he could safely stop the Jeep and arrest the driver (who he still believed was Jalen), since he had two deputies moving to try to spike the Jeep's tires. Marker Depo., 147:6-15. Officer Marker felt that Jalen was a threat in the vehicle, so he needed to stop him. Marker Depo., 149:8-12.

The pursuit continued on State Route 202 at speeds over 100 miles per hour. Marker Depo., 149:18-19. At some points, Officer Marker could not keep up with the Jeep, and it continued to pull away from his cruiser. Marker Depo., 150:3-8. Jalen did not slow down, and even ran several red lights while he continued to run from Officer Marker, but he generally stayed in his lane of travel unless passing slower-moving vehicles left of center. Marker Depo., 151:9-154:2; 157:4-7; 158:9-23. The Jeep was not slowing down, but continued to drive at speeds over 100 miles per hour. Marker Depo., 152:3-154:2. The video from Officer Marker's vehicle shows that it also reached speeds of over 100 miles per hour and ran red lights, but he backed off of pursuing the Jeep at some points because he was afraid he would strike another car at an intersection. Marker Depo., 155:6-14. Officer Marker never turned off his lights or siren. Marker Depo., 155:6-14; 151:9-10. As long as Officer Marker's lights and sirens were still activated, the pursuit was still ongoing. Marker Depo., 166:24-167:2.

Officer Marker had radioed ahead to deputies, who were setting up stop strips, and he believed he could stop the Jeep safely. Marker Depo., 166:8-10. He did not terminate the pursuit because of the likelihood of apprehension, and he remained in pursuit of the Jeep. Marker Depo., 168:15-17; 175:18-19. In fact, the majority of pursuits in which he had engaged were terminated. Marker Depo., 170:15-17. Officer Marker continued to keep the Jeep in sight as they travelled. Marker Depo., 172:13-15. As the pursuit progressed, traffic was getting heavier and there was construction. Marker Depo., 227:2-5. At one point, Officer Marker passed a school bus taking children to school at

9

102 miles per hour. Marker Depo., 248:14-21; 250:20-22. Chief McKinney ordered Officer Marker to terminate the pursuit once they reached Huber Heights traffic. Marker Depo., 177:2-4; 254:6-17; Marshall Depo., 132:18-24; McKinney Depo., 123:6-8. "Huber Heights traffic," was 100 to 200 yards after the intersection of State Route 202 and State Route 40. Marshall Depo., 132:18-24. Chief McKinney meant the retail area where traffic was heavy. McKinney Depo., 123:6-13. Officer Marker understood the order to mean that he was to terminate the pursuit after the intersection of State Route 202 and State Route 40. Marker Depo., 177:7-8; 254:22-23; Marshall Depo., 132:18-24. Officer Marker's intent was to terminate the pursuit if the deputies successfully spiked the Jeep's tires. Marker Depo., 177:25-178:1.

A Miami County deputy had set up the tire spike strips near the intersection of Ross Road. Marker Depo., 187:21-24. In fact, the tire spikes were successful. Marker Depo., 178:6-9. The deputy communicated to Officer Marker that the Jeep had successfully hit the spike strips on his right side just before Ross Road. Marker Depo., 258:2-22. They did not, however, stop the pursuit. Marker Depo., 178:10-12. After the Jeep hit the spike strips, Officer Marker slowed and backed off so that the deputies could pull back the spikes, but he did not stop pursuing the Jeep. Marker Depo., 188:16-24. And the Jeep did not slow down, so Officer Marker had to increase his speed to 104 miles per hour. Marker Depo., 262:22-25.

Finally, at the intersection of State Route 202 and State Route 40, the Jeep crashed, and Officer Marker saw smoke. Marker Depo., 263:10-15. Officer Marker thought the Jeep's tires had gone flat and he had veered and

10

hit a pole. Marker Depo., 264:25-265:1. He saw skid marks on State Route 202 before the intersection at State Route 40, but at that point, he did not know a second vehicle was involved. Marker Depo., 265:3-8; 266:15-17.

Officer Marker came upon a bad car crash. Marker Depo., 270:13-15. In fact, Chelsey Vollmer had been crossing State Route 40 in her vehicle on her way to daycare with her baby when Jalen ran the red light at the intersection of State Route 202 and collided with the driver's side of her car. Marker Depo., 282:8-10. Chelsey was killed by the impact. Her baby survived and was extricated from the vehicle. Jalen, who was driving the Jeep, was killed as well, but Tashaya, who had been riding in the Jeep's front seat during the pursuit, survived with injuries. The chase had never been terminated prior to impact. Marshall Depo., 140:4-7.

October 22, 2025 Decision, Entry, and Order at pgs. 1-6.

## II. Governing Law

{¶ 6} "In a case decided on summary judgment, we must determine whether an issue of material fact remains to be litigated, whether the moving party is entitled to judgment as a matter of law, and whether when viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can only reach a conclusion that is adverse to the nonmoving party." *Snyder v. Ohio Dept. of Natural Resources*, 2014-Ohio-3942, ¶ 20, citing Civ.R. 56(C) and *Temple v. Wean United, Inc*., 50 Ohio St.2d 317, 327 (1977). Having reviewed the record, we see no material factual dispute about what occurred prior to and during the police pursuit. The trial court's factual recitation quoted above accurately summarizes the events. Based on the evidence before us, which includes a police cruiser camera video of the entire pursuit, the real issue is whether reasonable minds construing

11

that evidence in Gillespie's favor could find that any of the officers involved or the City of Troy can be held liable for damages.

{¶ 7} As employees of a political subdivision, Marker, Marshall, Mumford, and McKinney are immune from liability unless their acts or omissions were "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6)(b). "This standard applies to law-enforcement officers just as it applies to other employees of political subdivisions." *Argabrite v. Neer*, 2016-Ohio-8374, ¶ 7, citing *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356 (1994). Revised Code Chapter 2744 also provides immunity for political subdivisions themselves. Under R.C. 2744.02(B)(1)(a), a political subdivision is immune from liability where "[a] member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct."

{¶ 8} Statutory immunity for a political subdivision or its employees is a question of law. *Burgin v. Eaton*, 2011-Ohio-5951, ¶ 26 (2d Dist.), citing *Conley v. Shearer*, 64 Ohio St.3d 284 (1992). "Whether a political subdivision employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner generally are questions of fact, however. Thus, a trial court may not grant summary judgment on the basis of R.C. 2744.02(B)(1)(a) or 2744.03(A)(6)(b) immunity unless reasonable minds can only conclude that the employee did not act willfully, wantonly, maliciously, reckless[ly], or in bad faith." (Citations omitted.) *Hoffman v. Gallia County Sheriff's Office*, 2017-Ohio-9192, ¶ 38 (4th Dist.), citing *Argabrite* at ¶ 15. When conducting our review, we "bear in mind that while many public employees face the potential for liability under R.C. 2744.03, no other public employee faces the potential danger, violence or unique statutory responsibilities a law-enforcement officer

12

faces. Not only does Ohio law require an officer to arrest and detain a person who is violating the law, R.C. 2935.03(A)(1), it also subjects that officer to potential criminal liability for negligently failing to do so, R.C. 2921.44(A)(2)." *Argabrite* at ¶ 15.

### III. Trial Court's Decision

**{¶ 9}** In overruling the appellants' summary judgment motion, the trial court first found a genuine issue of material fact as to whether Officer Marker acted recklessly in pursuing the Jeep driven by Jalen Alexander. It particularly focused on the time of day, the nature and seriousness of the offense prompting the pursuit, and the availability of a safer alternative. The trial court noted that the pursuit began in a residential neighborhood around 8:00 a.m. when people were going to work and school. The trial court noted that Marker did not terminate the pursuit when Alexander later passed a school bus at a speed of 102 miles per hour.

**{¶ 10}** The trial court also considered the nature and seriousness of the offenses for which Alexander was wanted by police. It noted that he had been charged with felonious assault for firing a handgun at his girlfriend's father approximately three weeks earlier. The trial court observed that the weapon had been confiscated near the time of the offense and that Marker was attempting to arrest Alexander for failure to appear in court on the felonious assault charge. The trial court reasoned that no emergency justified the high-speed pursuit. It noted the absence of evidence that Alexander had engaged in any violent behavior or obvious criminal conduct since the shooting incident. It also noted Marker's lack of certainty that Alexander was driving the Jeep at the time of the pursuit.

**{¶ 11}** Finally, the trial court opined that Marker ignored safer alternatives to apprehend Alexander. The trial court reasoned that the officer could have blocked the Jeep while it remained in the driveway, blocked the Imperial Court cul-de-sac where the driveway

13

was located, deployed spike strips on the cul-de-sac, or called for assistance. Instead, Marker pulled into a nearby parking lot where he was out of sight and waited for the Jeep to leave the Imperial Court residence where it was parked. The trial court concluded that the ensuing pursuit placed the public in "far more danger" than other options and supported a finding of recklessness.

{¶ 12} As for Sergeant Marshall, Captain Mumford, and Chief McKinney, the trial court found a genuine issue of material fact as to whether these supervisors acted recklessly by monitoring the pursuit on the radio and not stopping it. The trial court noted that Marshall, Mumford, and McKinney were informed of the details of the pursuit as it proceeded on State Route 202, a two-lane road. Those details included Marker and the fleeing Jeep reaching speeds well in excess of 100 miles per hour, passing slower vehicles, and running red lights while heading toward an area of increased traffic. Under these circumstances, the trial court determined that a jury could find recklessness in Chief McKinney's order for Marker to discontinue the pursuit only if and when it reached "Huber Heights traffic," which was understood to be approximately 100 to 200 years beyond the intersection of State Route 202 and State Route 40 where the fatal accident occurred.

{¶ 13} As for the City of Troy's immunity, the trial court noted that R.C. 2744.02(B)(1)(a) cloaks a political subdivision with immunity when a police officer operates a motor vehicle while responding to an emergency call provided that the officer's operation of the vehicle does not constitute willful or wanton misconduct. The trial court found a genuine issue of material fact as to whether Marker was responding to an emergency call as opposed to engaging in a basic patrol duty. The trial court acknowledged that an emergency existed once the Jeep fled. The trial court opined, however, that a jury reasonably could find no emergency when Marker initially went to Imperial Court prior to the

14

pursuit. The trial court also found a genuine issue of material fact as to whether Marker's operation of his police cruiser during the pursuit constituted willful or wanton misconduct.

## IV. Assignments of Error

{¶ 14} In five assignments of error, the appellants challenge each of the trial court's immunity determinations under R.C. Chapter 2744. The first assignment of error addresses the individual immunity of Officer Marker. It states:

**The trial court erred when it denied Defendant-Appellant, Shane Marker, the benefit of Chapter 2744 immunity.**

{¶ 15} Marker contends the trial court erred in finding a genuine issue of material fact as to whether he recklessly pursued Alexander. He asserts that he reasonably suspected Alexander was driving the Jeep. He knew Alexander was a fugitive who was wanted on two arrest warrants. Marker also argues that Alexander's high-speed flight in response to the officer's attempt to stop him itself constituted a dangerous felony that placed the public at risk. Once Alexander fled, Marker asserts, he remained mindful of safety concerns while trying to apprehend a fleeing criminal who posed a risk to others. Marker notes that he maintained a distance between his cruiser and Alexander's Jeep while trying to keep the Jeep in sight. Marker stresses that he used his lights and sirens to warn other vehicles, slowed at intersections, and correctly advised his supervisors that other traffic was responding and getting out of harm's way. Marker asserts that he backed farther away from the Jeep before reaching a more congested area to allow other officers to deploy spikes in the road. In short, he claims the undisputed evidence established that he considered everything a reasonable officer would consider before and during the pursuit.

{¶ 16} Regarding the trial court's rationale for finding a genuine issue of material fact on the immunity issue, Marker contends its first consideration, the time of day, did not

15

suggest recklessness. Although the pursuit occurred around 8:00 a.m. on a weekday, Marker notes that the conditions included full daylight with excellent visibility, making it easier for him to drive safely at high speeds. He also asserts that there was light traffic, despite the time of day. He contends his cruiser camera recording reveals that nearly the entire pursuit occurred on a straight, rural stretch of dry road with good visibility and sparse traffic. He asserts that the few vehicles encountered, including the school bus mentioned by the trial court, reacted appropriately and moved aside. Therefore, he contends the time of day played no adverse role in the incident.

{¶ 17} As for the second factor cited by the trial court, the nature and seriousness of the offenses at issue, Marker challenges the trial court's downplaying of the importance of apprehending Alexander. Although Alexander may have been wanted for misdemeanor failure to appear in court, Marker notes that the underlying court case involved his recent attempt to shoot his girlfriend's father. Marker stresses too that he had a legal duty to try to apprehend Alexander on the warrant, making his initial attempt to stop the Jeep appropriate. Moreover, Marker asserts that when the Jeep fled at high speed, Alexander's failure to obey a signal to stop constituted a dangerous felony. Marker contends the trial court improperly failed to evaluate the entire situation when assessing the nature and seriousness of Alexander's offenses.

{¶ 18} Finally, regarding the third consideration cited by the trial court, the availability of a safer alternative, Marker claims the record is devoid of evidence that any alternatives were safer or that they would have succeeded. Marker contends the trial court cannot use 20/20 hindsight to second-guess the professional judgment he exercised in the moment. He insists that speculation about what might have occurred if he had chosen another course of action does not satisfy Civ.R. 56. He argues that the overriding issue is whether the actions

16

he in fact took were reckless without regard to speculation about what else he might have done. As for the actions he took, he asserts that there is no genuine issue of material fact and that he is entitled to immunity as a matter of law.

{¶ 19} For her part, appellee Gillespie contends the trial court properly denied summary judgment because reasonable minds could find that Marker acted wantonly or recklessly. She argues that the policies and culture of the Troy police department created an ulterior incentive for him to engage in a risky pursuit. She alleges the existence of a numbers-based performance system within the department, an aggressive culture that directed officers to increase their numbers regarding use of force and pursuits, a departmental history of engaging in aggressive pursuits, and a history of tolerating overly aggressive officers. Gillespie also asserts that Marker's own employment history, personality, and attitude reflected a proclivity toward unsafe aggression.

{¶ 20} In support of finding a genuine issue of material fact, Gillespie further argues: (1) Marker did not know whether Alexander's girlfriend and her child might be in the Jeep, (2) Marker did not know who was driving the Jeep, and there was no immediate need to apprehend the driver because the Jeep presented no danger until the driver fled in response to Marker's effort to stop it, (3) the speed of the pursuit was excessive, and it included violations of every traffic-control device, (4) the traffic volume presented a worst-case scenario—light enough to accommodate high speeds but heavy enough to create a risk of harm to motorists travelling to work, school, or daycare, (5) the officers' familiarity with the stretch of Route 202 where most of the pursuit occurred, meaning that they had knowledge of the specific risks involved, (6) the nature and seriousness of the offenses that prompted Marker's pursuit, a window-tint violation and/or outstanding arrest warrants, did not justify the time, place, and manner of the pursuit, (7) Marker had safer alternatives than engaging

17

in a protracted pursuit at 8:00 a.m. on a weekday, (8) the pursuit violated the police department's written policies, and (9) Gillespie's experts' affidavits and reports support a finding that the pursuit constituted willful, wanton, extreme, and outrageous conduct that was likely to result in serious injury or death, which in fact occurred.

{¶ 21} Upon review, we conclude that the trial court erred in denying Marker summary judgment based on immunity. He is immune from liability unless he acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6)(b). There is no assertion that he acted maliciously or in bad faith. The issue is whether a reasonable trier of fact could find that he acted wantonly or recklessly. "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." (Citations omitted.) *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 33. "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." (Citations omitted.) *Id.* at ¶ 34. "'[Recklessness] requires a finding that the probability of harm occurring is great and that the harm will be substantial. A possibility or even probability is not enough as that requirement would place the act in the realm of negligence.'" *Pendry v. Troy Police Department*, 2020-Ohio-3129, ¶ 17 (2d Dist.), quoting *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987). "Recklessness requires knowledge by the actor that his 'conduct will in all probability result in injury.'" *Argabrite*, 2016-Ohio-8374, at ¶ 21, quoting *O'Toole v. Denihan*, 2008-Ohio-2574, paragraph three of the syllabus; *A.J.R. v. Lute*, 2020-Ohio-5168, ¶ 23, quoting *O'Toole*, paragraph three of the syllabus ("In order for us to find that appellants were reckless, we must determine that they were 'conscious that [their] conduct [would] in all probability result in injury.'").

18

{¶ 22} Viewing the evidence in a light most favorable to Gillespie, we conclude that Marker did not act wantonly as a matter of law. Wanton misconduct involves failure to exercise any care. Here Marker exercised significant care by maintaining contact with his supervisors, activating his lights and sirens, slowing for intersections, keeping distance between his cruiser and Alexander's Jeep, and backing off as he approached Huber Heights. Even if we accept Gillespie's assertion that a failure to exercise "any care" does not mean literally "no care," Marker exercised more than de minimus care, taking several steps to minimize the danger.

{¶ 23} Contrary to the trial court's conclusion, we also see no genuine issue of material fact as to whether Marker acted recklessly. An indispensable component of recklessness is the actor's consciousness that his conduct "in all probability" will result in injury. As a practical matter, assessing whether a reasonable trier of fact could find this standard satisfied requires little more than viewing Marker's cruiser camera recording of the pursuit. Although it began in a residential area, it took place there only briefly.

{¶ 24} Within the first minute, Marker activated his lights and sirens. Within two minutes, both vehicles proceeded onto State Route 202. Shortly thereafter, the speed limit increased to 55 miles per hour on the rural, mostly straight, dry, two-lane road. Traffic was light, and visibility was good. Marker and Alexander encountered a few other vehicles, most of which pulled aside apparently in response to the lights and sirens. Marker and Alexander occasionally crossed the yellow center line and passed other vehicles. Although they passed a school bus, it had pulled to the side, and the video does not show any children. They also proceeded through red lights, but Marker slowed as he did so. Marker's speed during the pursuit often exceeded 100 miles per hour, reaching a maximum of 120 miles per hour.

**{¶ 25}** Nearly seven minutes into the chase, Chief McKinney advised Marker to terminate it if Alexander reached Huber Heights traffic. Marker interpreted this command as an instruction to terminate on the far side of the U.S. Route 40 intersection. Shortly before the fatal accident, Marker backed away from Alexander because the officer knew deputies had deployed spikes across State Route 202 a quarter mile to a half mile ahead. About seven and one-half minutes into the pursuit, Alexander's Jeep hit the spikes, after which the Jeep ran the red light at U.S. Route 40 and struck Chelsey Vollmer's vehicle at a speed of 108 miles per hour.

**{¶ 26}** Although Marker's pursuit involved high speeds, we do not believe a reasonable trier of fact viewing the cruiser camera recording could find that his conduct "in all probability" would result in injury. We recognize that "the determination of recklessness is typically within the province of the jury." *O'Toole*, 2008-Ohio-2574, at ¶ 75. But "the standard for showing recklessness is high," and summary judgment is appropriate when the record lacks evidence that an officer knew his conduct in all probability would result in injury. *Argabrite*, 2016-Ohio-8374, at ¶ 21. "A court making [an immunity] determination must look at the evidence and determine whether it is so one-sided that the party claiming immunity should prevail as a matter of law." *Smathers v. Glass*, 2022-Ohio-4595, ¶ 3. "Given officers' statutory duties to arrest and detain individuals violating the law, the burden necessary to deny immunity to those officers is onerous." *Argabrite* at ¶ 31. "The danger of a high-speed chase alone is not enough to present a genuine issue of material fact concerning whether an officer has acted with a malicious purpose, in bad faith or in a wanton or reckless manner." *Id*. at ¶ 16, citing *Shalkhauser v. Medina*, 2002-Ohio-222, ¶ 40 (9th Dist.). While Marker's pursuit ended in a tragic death, "[w]e must apply the law without consideration of emotional ramifications and without the benefit of 20-20 hindsight." *O'Toole* at ¶ 76. After reviewing the

20

record in a light most favorable to Gillespie, we see no genuine issue of material fact and conclude that Marker is entitled to immunity as a matter of law.

{¶ 27} The trial court's concerns about the pursuit—the time of day, the nature and seriousness of the offense prompting it, and the availability of a safer alternative—fail to establish a genuine issue of material fact on the issue of recklessness. Each of these considerations is relevant to the part of the recklessness standard addressing whether an officer acted with "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances." (Citations omitted.) *Anderson*, 2012-Ohio-5711, at ¶ 34. However, a finding of recklessness also "requires knowledge by the actor that his 'conduct will in all probability result in injury.'" *Argabrite* at ¶ 21, quoting *O'Toole* at paragraph three of the syllabus.

{¶ 28} The last two considerations cited by the trial court have no bearing on whether Marker's conduct during the pursuit "in all probability" would result in injury. Whether his conduct likely would result in injury must be determined, of course, by examining what he did. The likelihood of Marker's actual conduct resulting in injury remained the same regardless of what prompted him to act or whether he could have pursued a different course. These considerations had no impact on whether the pursuit that occurred in all probability would result in injury.

{¶ 29} As for the time of day, it was relevant to the degree of risk involved in the pursuit. But this consideration can cut both ways. On one hand, the trial court emphasized that the pursuit occurred around 8:00 a.m., when people go to school and work. On the other hand, the time of day also meant full daylight and excellent visibility, conditions that lessened the risk of a high-speed chase. Moreover, any inference that the pursuit took place amid

21

rush-hour traffic is dispelled by the cruiser camera recording, which depicts sparse traffic on a rural stretch of a dry road.

{¶ 30} Gillespie contends the policies and culture of the Troy police department created an ulterior motive for Marker to act recklessly. She cites a numbers-based performance system, an aggressive law-enforcement culture, a departmental history of engaging in aggressive pursuits, and a history of tolerating overly aggressive officers. Gillespie also claims Marker's own history and characteristics showed a proclivity toward unsafe aggression.

{¶ 31} Even if true, however, these assertions have no bearing on what in fact occurred during Marker's pursuit. Again, a key issue for purposes of recklessness is whether Marker's conduct "in all probability" would result in injury. Gillespie's arguments focus on *why* Marker did what he did, not whether *what* he did in all probability would result in a traffic accident. Regardless of why he acted, his cruiser camera recording fails to support a finding that his conduct in all probability would result in injury.

{¶ 32} Gillespie raises other arguments that also have no bearing on whether Marker's conduct was likely to result in injury. She asserts that he did not know whether Alexander's girlfriend and her young child might be in the Jeep or who was driving the Jeep. She argues too that the nature and seriousness of Alexander's offenses did not justify the pursuit, that Marker had safer alternatives, and that the pursuit violated police department policies. Again, these issues may be relevant to the portion of the recklessness standard addressing whether Marker acted with "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances[.]" (Citations omitted.) *Anderson*, 2012-Ohio-5711, at ¶ 34. But the degree of risk created by the pursuit did not change based on who occupied the Jeep, the relative seriousness of Alexander's

offenses, or whether the pursuit violated departmental policy. Therefore, Gillespie's arguments fail to demonstrate a genuine issue of material fact as to whether Marker's pursuit in all probability would result in injury. *Compare Argabrite*, 2016-Ohio-8374, at ¶ 25 (recognizing that "evidence of a violation of departmental policy" does not create a genuine issue of material fact on recklessness without evidence that the policy violation in all probability would result in injury).

{¶ 33} In any event, to the extent that the identity of the Jeep's driver has relevance, Marker reasonably believed that Alexander was driving the Jeep. We see no evidence to support a contrary finding. Marker knew about the Miami County arrest warrant for Alexander. He also knew about the Greene County warrant. Marker additionally knew that Alexander sometimes drove a Jeep registered to his girlfriend, who lived on Imperial Court. On the morning in question, Marker saw the Jeep on Imperial Court with its engine running. After moving to a vantage point out of sight of the Jeep, Marker watched it turn on a residential street. He observed the silhouette of a person he believed to be Alexander. Marker followed the Jeep, intending to pull it over for a window-tint violation. When Marker activated his lights and sirens, the Jeep fled in response, adding credence to his belief that Alexander was driving.

{¶ 34} As for Gillespie's claim that there was no immediate need to apprehend the Jeep's driver, the Miami County warrant commanded law enforcement officers to arrest Alexander and to pursue him in that county or any other county. We note too that Alexander's high-speed flight in response to Marker's lawful signal further justified the attempt to apprehend him. "Not only does Ohio law require an officer to arrest and detain a person who is violating the law, R.C. 2935.03(A)(1), it also subjects that officer to potential criminal liability for negligently failing to do so, R.C. 2921.44(A)(2)." *Argabrite* at ¶ 15. An officer need

23

not "sit idly by while a suspect flees the scene of a crime, particularly when the suspect's flight itself endangers the general public further." *Id*. at ¶ 16.

{¶ 35} Gillespie also claims the pursuit was reckless because of its speed, the violation of traffic-control devices, the traffic volume, the time of day, and the officers' familiarity with the stretch of road. When reviewing the cruiser camera recording, we considered these issues. After examining the evidence in a light most favorable to Gillespie, we see no genuine issue of material fact and conclude that Marker is entitled to judgment as a matter of law. Although every high-speed pursuit involves some risk, we do not believe a reasonable trier of fact reviewing what occurred here could find that Marker knew in all probability an injury would occur.

{¶ 36} Gillespie asserts that her two experts' affidavits and accompanying reports support a finding that Marker's conduct was reckless. One of the experts, an accident reconstructionist, opined that (1) there was no justification for the pursuit, (2) the degree of risk was unjustified, (3) the pursuit should not have been started, (4) continuation of the pursuit was unjustified because Marker did not know who was driving or occupying the Jeep, and (5) Marker or his supervisors should have terminated the pursuit. However, these opinions do nothing to demonstrate a genuine issue of material fact as to whether Marker's pursuit of Alexander in all probability would result in injury. *Compare Argabrite*, 2016-Ohio-8374, at ¶ 26 (finding no genuine issue of material fact on the immunity issue despite an expert's opinion that officers unjustifiably continued a pursuit "when the risk to the public outweighed engaging in the pursuit, when the risk to personal safety and the safety of others outweighed the danger if the suspect was not apprehended and when, because they knew the suspect's identity, the risk from the attempt to capture outweighed the risk of the suspect's escape").

**{¶ 37}** Gillespie's second expert was a professor and former police officer. She cites his opinion that (1) no immediate need for apprehension existed, (2) the pursuit violated Troy's pursuit policy, (3) Marker knowingly disregarded substantial risks that were likely to result in serious injury or death, and he or his supervisors should have terminated the pursuit as the crash was foreseeable, (4) the three supervising officers knowingly disregarded the risk and acted recklessly by allowing Marker to continue the pursuit, and (5) Marker and the supervising officers engaged in willful, wanton, extreme, and outrageous conduct that was likely to result in serious bodily injury and death, which in fact occurred.

**{¶ 38}** Once again, the alleged lack of need for immediate apprehension fails to establish a genuine issue of material fact as to whether Marker's conduct in all probability would result in injury. As for other aspects of the expert's opinion, they also fail to demonstrate a factual dispute for trial. The expert's opinion that Marker and the supervisors disregarded a substantial risk and should have terminated the pursuit does not create a genuine issue of material fact as to whether Marker's conduct in all probability would result in injury. In this case, resolution of that issue requires little more than reviewing the cruiser camera recording. Moreover, the expert's opinion about the existence of "willful, wanton, extreme, and outrageous conduct" does not establish a factual issue for trial. *Seege v. Smith*, 2014-Ohio-5450, ¶ 34 (2d Dist.). "'[J]ust because a plaintiff can find an expert to state in an affidavit that an act was reckless does not mean that there is a genuine issue for trial as to whether the defendant lost [his] immunity due to recklessness.'" *Id.* at ¶ 35, quoting *Fediaczko v. Mahoning Cty. Children Servs.*, 2012-Ohio-6090, ¶ 31 (7th Dist.); *see also Shalkhauser*, 2002-Ohio-222, at ¶ 41 (9th Dist.) ("Appellant's witnesses testified that appellees violated the police department's fresh-pursuit policy, failed to exercise any care for the public during the pursuit, and engaged in conduct that was wanton, reckless, extreme,

25

and outrageous. Appellant fails to appreciate that this testimony does not create any issues of fact . . . .").

{¶ 39} Finally, the alleged violations of Troy's pursuit policy cannot create a genuine issue of material fact without evidence that Marker knew those violations in all probability would result in injury. *Argabrite*, 2016-Ohio-8374, at ¶ 25. Gillespie contends Marker violated Troy's pursuit policy by (1) failing to request back up and inform the communication center of his intent to stop Alexander, (2) initiating the pursuit without an immediate need for apprehension, (3) failing to terminate the pursuit when Alexander could have been located and arrested later, (4) engaging in the pursuit when Alexander had not committed an offense involving a risk of serious physical harm or death, (5) unduly endangering himself and others when the need for apprehension did not outweigh the danger created by the pursuit, (6) failing to terminate the pursuit when the risks to safety outweighed the danger to the public, and (7) failing to terminate when the pursuit entered the jurisdiction of the Miami County Sheriff's Department.

{¶ 40} As with several of Gillespie's other arguments, we see no evidence that Marker's alleged policy violations in all probability would result in an injury. By their nature, the alleged violations had no bearing on the degree of risk created by his pursuit of Alexander. None of the alleged violations made what occurred during the pursuit any more dangerous than it would have been without them. Having concluded that Marker is entitled to judgment as a matter of law on the issue of immunity, we sustain the first assignment of error.

{¶ 41} The second, third, and fourth assignments of error state:

**The trial court erred when it denied Defendant-Appellant, Zachariah Mumford, the benefit of Chapter 2744 immunity.**

26

**The trial court erred when it denied Defendant-Appellant, John Marshall, the benefit of Chapter 2744 immunity.**

**The trial court erred when it denied Defendant-Appellant, Shawn McKinney, the benefit of Chapter 2744 immunity.**

{¶ 42} The second, third, and fourth assignments of error address the immunity of the three supervisors who monitored Marker's high-speed pursuit and did not terminate it. Mumford, Marshall, and McKinney contend they asked Marker pertinent questions and relied on his accurate, real-time information to make reasonable decisions about allowing the pursuit to continue until it approached Huber Heights.

{¶ 43} In response, Gillespie asserts that the supervisors should have ordered Marker to terminate the pursuit prior to the accident. She notes that they monitored the pursuit via radio as it happened and were aware of the speeds and other circumstances involved.

{¶ 44} Based on our determination that Marker did not act with malicious purpose, in bad faith, or in a wanton or reckless manner when he pursued Alexander, it follows that the three supervising officers were entitled to summary judgment on the issue of statutory immunity. Contrary to the trial court's ruling, we do not believe a trier of fact reasonably could find that Mumford, Marshall, or McKinney acted recklessly in failing to stop the pursuit prior to the accident. Accordingly, the second, third, and fourth assignments of error are sustained.

{¶ 45} The fifth assignment of error addresses the City of Troy's immunity. It states:

**The trial court erred when it denied Chapter 2744 immunity to Defendant-Appellant, the City of Troy, Ohio.**

27

{¶ 46} The city argues that R.C. 2744.02(B)(1)(a) cloaks it with immunity from liability because Marker was responding to an emergency call and his operation of his police cruiser during the pursuit did not constitute willful or wanton misconduct. For her part, Gillespie contends reasonable minds could conclude that at least one of the four officers involved engaged in willful or wanton misconduct.

{¶ 47} As noted above, the trial court declined to find the city entitled to summary judgment for two reasons. First, it found a genuine issue of material fact as to whether Marker was responding to an emergency call. It opined that he learned about Alexander's warrants and saw the parked Jeep while performing non-emergency, basic patrol duties. The trial court acknowledged the existence of an emergency once Alexander fled in response to Marker's actions. But if found a genuine issue of material fact "as to whether Officer Marker was 'responding to an emergency call' when he initially went to Imperial Court to look for [Alexander], even up to the point he attempted to stop the Jeep, thus causing it to flee." Second, the trial court found a genuine issue of material fact as to whether Marker's operation of his cruiser during the pursuit constituted willful or wanton misconduct.

{¶ 48} We conclude that the trial court erred in denying the city summary judgment based on immunity. Officer Marker's initial attempt to stop the Jeep was justified as a matter of law based on his reasonable belief that Alexander was driving, his knowledge of Alexander's arrest warrants, and an apparent window-tint violation. Indeed, Marker had a professional duty as a law-enforcement officer to attempt to effect Alexander's arrest on the warrants. Although Marker may have discovered the warrants and observed the Jeep while performing basic patrol duties, the "emergency call" analysis is not limited to what occurred prior to the pursuit.

28

{¶ 49} An "emergency call" is defined by R.C. 2744.01(A) as "a call to duty." It includes, but is not limited to, "communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response on the part of a peace officer." A "call to duty" exists where "a response by a peace officer is required by the officer's professional obligation." *Smith v. McBride*, 2011-Ohio-4674, ¶ 23. "Rather than concentrating solely on the events preceding or giving rise to [a] pursuit," a reviewing court should focus on all attendant facts and circumstances, "*including* the operation of [a] fleeing motorist's vehicle during [a] pursuit." (Emphasis in original.) *Wagner v. Heavlin*, 136 Ohio App. 3d 719, 729 (7th Dist. 2000) (concluding that an "emergency call" existed when a suspect ran a red light and fled at high speed after an officer attempted a traffic stop for operating a motorcycle without a license); *see also Shalkhauser*, 2002-Ohio-222, at ¶ 24 (9th Dist.), quoting *Wagner*.

{¶ 50} Here Marker satisfied a professional obligation by attempting to stop Alexander and arrest him on outstanding warrants. Alexander's high-speed flight in response created a further call to duty because Marker personally observed an inherently dangerous situation that demanded an immediate response. Therefore, Marker's pursuit constituted an "emergency call" as a matter of law.

{¶ 51} The only remaining issue is whether Marker engaged in willful or wanton misconduct when operating his cruiser. "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson*, 2012-Ohio-5711, at ¶ 32. "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at ¶ 33.

{¶ 52} Having determined that Marker, Mumford, Marshall, and McKinney did not act recklessly as a matter of law, they necessarily did not engage in willful or wanton misconduct. Indeed, willful, wanton, and reckless actions are viewed on a continuum, "'i.e., willful conduct is more culpable than wanton, and wanton conduct is more culpable than reckless.'" *Strayer v. Barnett*, 2017-Ohio-5617, ¶ 38 (2d Dist.), quoting *Anderson* at ¶ 42.

{¶ 53} We note too that wanton misconduct involves failure to exercise any care, whereas Officer Marker exercised some care by activating his lights and sirens, slowing for intersections, maintaining distance between his cruiser and Alexander's Jeep, and backing off as he approached Huber Heights. As for willful misconduct, it requires a positive mental state prompting an injurious act that is akin to an intent to cause harm. *Powlette v. Carlson*, 2022-Ohio-3257, ¶ 33 (2d Dist.), quoting *Rondy v. Richland Newhope Industries, Inc.*, 2016-Ohio-118, ¶ 45-46 (5th Dist.); *Wyatt v. Springfield*, 2024-Ohio-3334, ¶ 12 (2d Dist.), citing *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 375 (1998); *see also Coterel v. Reed*, 2016-Ohio-7411, ¶ 21 (2d Dist.) (recognizing that "willful misconduct require[s] proof of an intentional or deliberate purpose to act in a manner that is likely to cause injury"). We see no evidence that Marker or the supervising officers engaged in willful misconduct.

{¶ 54} In opposition to our conclusion, Gillespie cites the definition of willful misconduct in *Anderson* and insists that the four individual defendants engaged in such misconduct by intentionally deviating from their own policies, deliberately violating those policies by pursuing and/or authorizing the pursuit of Alexander, and purposefully engaging in wrongful acts by prioritizing his arrest over public safety while knowing the likelihood of an injury-causing crash.

{¶ 55} We see no genuine issue of material fact based on alleged violations of the city's pursuit policies. An officer's violation of departmental policy "is not per se willful,

30

wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct." *Anderson*, 2012-Ohio-5711, at ¶ 37. The policy must be violated intentionally and an officer's non-compliance with the required precautions must involve a probability of injury. *Id.* at ¶ 38. A violation of departmental policy does not create a genuine issue of material fact for trial absent evidence that the officer knew the violation in all probability would result in injury. *Argabrite*, 2016-Ohio-8374, at ¶ 25. Even assuming, arguendo, that one or more policy violations occurred, no reasonable trier of fact could find that any of the four individual defendants knew the policy violation in all probability would result in injury. Therefore, the city is entitled to summary judgment. The fifth assignment of error is sustained.

### V. Conclusion

{¶ 56} Having sustained all five assignments of error, we reverse the trial court's judgment and remand the case to the trial court for entry of final judgment in the appellants' favor.

. . . . . . . . . . . .

LEWIS, P.J., and HANSEMAN, J., concur.